## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Versacold USA, Inc., | Civil Action: 09-CV-02857-DSD-JJK |
| Plaintiff, | |
| v. | |
| Inland American Brooklyn Park Atlas, L.L.C., | **DECLARATION OF MICHAEL BROADFOOT** |
| Defendant. | |

I, Michael Broadfoot, declare as follows:

1.     I am a Vice President of Inland American HOLDCO Management, LLC, the entity responsible for management of the assets of the sole member of each of the Defendants.  I have personal knowledge of the recent discussions with Plaintiff Versacold USA, Inc. ("Versacold") relating to the default under the leases (the "Leases") that Versacold's predecessors executed for lease of various cold storage facilities from Defendants; the default is as a result of the insolvency of Hf. Eimskipafelag Islands (the "Guarantor") and the Guarantor's entry into Icelandic composition proceedings.   Attached as Exhibit A is a copy of the Guarantor's "Explanatory Memorandum for Creditors in respect of the Petition for Licence to Seek Composition with the Creditors" (the "Explanatory Memorandum").

2.     I am aware of Versacold's attempts to enjoin the eviction action commenced by Inland American Brooklyn Park Atlas, L.L.C. in Hennepin County District Court as a result of Versacold's default under its Lease for premises in Brooklyn Park, Minnesota.  It is my understanding that Versacold claims that the insolvency of the Guarantor and its filing of composition proceedings do not constitute a material breach of the Lease.  This allegation is

simply not true and is inconsistent with the express provisions of the Leases.  Specifically, paragraph 2.1 of the Leases (which are in material respects identical) provides that an Event of Default would occur under the Leases if:

> the Tenant or Guarantor makes an assignment for the benefit of creditors or becomes bankrupt or insolvent or makes an application for relief from Creditors or takes the benefit of any statute for bankrupt or insolvent debtors or makes any proposal or arrangement with creditors (collectively, a "proceeding for relief"), or admits in writing its inability to pay its debts as they come due, or steps are taken for the winding up or other termination of the Tenant's or the Guarantor's existence or the liquidation of the Tenant's or the Guarantor's assets, or either Tenant or Guarantor shall become the subject of any involuntary proceeding for relief which is not dismissed within sixty (60) days of its filing or entry;

3.     Despite Versacold's claims to the contrary, the Guarantor's insolvency and entry into composition proceedings has significantly diminished, if not erased, the strength of the Guarantor and the value of its guaranties of the Leases.  As a result, Defendants and the thousands of investors in the REIT that is the sole member of Defendants, are in jeopardy of having Versacold stop making rent payments under the Leases and not having the strength of the Guarantor that Defendants bargained for only two years ago.  Having adequate security to assure a rental stream of multiple millions of dollars is vital, and is certainly material.  This is especially true in light of the fact Defendants paid Versacold's predecessor $170,500,000 for the facilities in reliance on a strong Guarantor.  The rent due for the remainder of the lease at the Brooklyn Park facility alone is nearly $12 million.

4.     Our concerns about the future of the rental payments under the Leases are not merely hypothetical.  According to financial statements it provided to us, Versacold has no tangible net worth, making the financial viability of the Guarantor even more important.  It is our belief that the entity that survived the Guarantor's composition proceedings has no assets, just liabilities, and is no longer a suitable guarantor.  Specifically, as set forth on pages 17 and 24 of

the Explanatory Memorandum, the Guarantor represented that a liquidation of its assets would produce only a 2.1% recovery for its unsecured creditors. Even under the composition proposal, unsecured claimants like Inland would recover on 11.9% of their claims, and that recovery is through the issuance of shares in a company – referred to in the Explanatory Memorandum as "New Eimskip" – that is the recipient of the remaining assets of the Guarantor. It defies logic for Versacold to claim that the Guarantor is solvent (or that its insolvency is immaterial) when it can pay such a small portion of its creditors' claims.

5.      Versacold's claim that the Guarantor is not insolvent is directly contradictory to the Guarantor's own statements in its Explanatory Memorandum. On page 16 of the Memorandum, in a section titled "Inability to Meet All Obligations," the Guarantor admits:

> Since October 2008 Eimskip has not been servicing its borrowings as agreed with or acquiesced in by financial creditors under the Standstill Agreements and de facto standstill arrangements. But for these arrangements, Eimskip would be unable to meet its debts as they fall due and would need to file for liquidation.

This admission of Guarantor's inability to pay its debts is, in and of itself, a default under the Lease.

6.      Despite knowing our concerns about the strength of the Guarantor, Versacold has refused to provide a suitable replacement guarantor. Versacold's representatives have also told us repeatedly that the rent under the Leases exceeds market rent. Accordingly, it is likely that in the future, Versacold will ask for rent reductions or simply vacate and stop paying rent. Moreover, 49% of Versacold has been recently purchased by the equity fund owner of one of its competitors – The Yucaipa Companies. In the recent past, Versacold has isolated its assets. The evidence available to us also indicates that there is declining occupancy at some of the eleven sale-leaseback facilities. As a result, a consolidation of Versacold's and Yucaipa's operations,

resulting closure of some facilities, and a bankruptcy filing by Versacold, all appear in our judgment to be highly likely.

7.      The Event of Default under the Leases as a result of the Guarantor's insolvency and entry into composition proceedings has caused Fifth Third Bank, the lender to Defendants on seven of the subject properties, to claim Defendants are in default under their loan documents for those properties.

8.      Versacold claims that Defendants somehow waived their rights to claim defaults under the Leases by making a claim in Guarantor's Icelandic composition proceedings. It is important to note that the claim was made "contingent" pending a future specific financial claim. Nothing about that process waived any default under the Leases. Versacold's argument that Defendants waived the default by accepting rent is equally unavailing. Versacold completely ignores paragraph 11.1 of the Leases, which plainly provides that:

> A receipt by Landlord of rent or other payment with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord of any provision of this Lease shall be deemed to have been granted unless expressed in writing and signed by Landlord.

9.      It is my belief that Versacold intentionally sought to delay us from filing Inland's eviction action in Hennepin County District Court in hopes of being able to commence their federal court action first.

10.     Specifically, we informed Versacold that Inland intended to commence an eviction action. In response, Versacold's representatives pleaded for Inland to delay its court filing, telling us that such action could negatively affect Versacold's position with its lenders. In a spirit of compromise, we acceded to their initial demands. Shortly thereafter, Versacold asked for an emergency meeting to discuss a possible resolution. Versacold's representatives even

went so far as to schedule a meeting for Thursday, September 24, 2009 at Midway Airport in Chicago.   Thereafter, they abruptly canceled the meeting.   We tried reaching Versacold's representatives for the remainder of Thursday, the 24th and Friday, the 25th in an effort to discuss a possible resolution.   After receiving no response, we authorized our counsel in Minnesota to file the eviction action on Monday, September 28th.   As evidence by the file-stamped first page of the Eviction Complaint attached hereto as <u>Exhibit B</u>, our eviction action was filed at 10:05 a.m. on September 29th.

11.    But for Versacold's claim that they wished to discuss a resolution and its representatives' pleas for more time to have those discussions, we would have filed our eviction action during the week of September 21st.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Michael Broadfoot

4638154_1.DOC

Explanatory Memorandum for Creditors
in respect of the
Petition for a Licence to
Seek Composition with the Creditors
of Hf. Eimskipafelag Islands



EXHIBIT

A

CONTENTS

1.   DEFINITIONS AND INTERPRETATION.................................................... 4

2.   STATUS OF PETITIONER........................................................................ 8

3.   HYPOTHETICAL BANKRUPTCY............................................................ 16

4.   COMPOSITION PROPOSAL .................................................................. 18

APPENDICES ................................................................................................ 27

1    EIMSKIP GROUP STRUCTURE CHART.................................................. 27

2    SCHEDULE OF SUPPORTING CREDITORS ........................................ 29

3    EIMSKIP GROUP CONSOLIDATED ACCOUNTS AS AT 31 JANUARY
     2009 ................................................................................................ 30

4    EIMSKIP BALANCE SHEET AS AT 31 JANUARY 2009 ....................... 31

5    ENTITY PRIORITY MODEL - SUMMARY ............................................ 32

6    AGREEMENTS WITH SECURED LENDERS - SUMMARY ................... 37

7    BYLAWS OF NEW EIMSKIP .............................................................. 39

8    NEW EIMSKIP RESTRUCTURING – SUMMARY OF FINANCIAL
     PROJECTIONS AND VALUATION CONSIDERATIONS ...................... 39

### Important Notice to Creditors

This Document has been prepared by Eimskip in relation to a petition for a licence to seek a composition with creditors with a view to concluding a Composition Agreement with creditors pursuant to the Icelandic Act No 21/1991 on Bankruptcy Proceedings, etc. Nothing in this Document (or any other document issued or appended to it) should be relied on for any other purpose including, without limitation, for the purchase or acquisition of, or in connection with the purchase or acquisition of, any shares in or any asset of, Eimskip, the Eimskip Group or New Eimskip. The information contained in this Document has been prepared by Eimskip based upon information available to it. To the best of Eimskip's knowledge, information and belief, the information contained in this Document is factually correct. Eimskip has taken reasonable steps to ensure, to the extent reasonably possible in the circumstances, that this Document contains the information reasonably necessary to enable creditors to make an informed decision in respect of the Composition Proposal.

Certain creditors (the **Supporting Creditors**) have indicated their support for the Composition Proposal. You will find their names at Appendix 2.

As at the Petition Date, the Supporting Creditors collectively held or represented approximately 72% per cent. by value and 31% per cent. by number of the Composition Claims. The Supporting Creditors agreed, at an early stage of the restructuring discussions, to enter into confidentiality agreements which, *inter alia*, acknowledged that Eimskip would supply them with information relating to the progress of the restructuring. This information, to the extent to which it is considered reasonably necessary in order for the creditors to make an informed decision on the Composition Agreement, has been incorporated into this Document and made public.

None of the Eimskip's financial, legal or other advisers, the Supporting Creditors (and their financial, legal or other advisers) or the senior lenders (and their financial, legal or other advisers) who engaged in discussions or consulted with Eimskip, the Eimskip Group or their financial, legal or other advisers concerning the Petition and/or who assisted with the distribution of documentation relating to the Petition, the submission of claims and/or the voting procedures in respect of the Composition Proposal, has verified that the information contained in this Document is in accordance with the facts and does not omit anything likely to affect the import of such information and each of these persons expressly disclaims responsibility for such information.

None of the Eimskip's financial, legal or other advisers, the Supporting Creditors (and their financial, legal or other advisers) or the senior lenders (and their financial, legal or other advisers) who engaged in discussions or consulted with Eimskip, the Eimskip Group or their financial, legal or other advisers concerning the Petition and/or who assisted with the distribution of documentation relating to the Petition, the submission of claims and/or the voting procedures in respect of the Composition Proposal assume any obligation to notify creditors of any future information which may affect the information contained in this Document, or otherwise to update this Document in any respect.

The statements contained herein are made as at the date of this Document, unless some other time is specified in relation to them, and service of this Document shall not give rise to any implication that there has been no change in the facts set forth herein since such date. Nothing contained herein shall be deemed to be a forecast, projection or estimate of Eimskip's, the Eimskip Group's or New Eimskip's (or any of their affiliates') future financial performance except where otherwise specifically stated.

Where this Document does include estimates of Total Eimskip Claims, these are illustrative and based on the best estimate of likely claims as at the Petition Date.   The actual claims submitted by creditors during the Composition Period may be materially different.

Where this Document does include forward looking statements, statistics and projections, the accuracy and completeness of all such statements, including, without limitation, statements regarding Eimskip's, the Eimskip Group's or New Eimskip's (or any of their affiliate's) future financial position, strategy, projected costs, and plans and objectives of management for future operations is not warranted or guaranteed. Although Eimskip believes that the expectations reflected in such statements are reasonable, no assurance can be given that such expectations will prove to have been correct.

Eimskip's audited financial statements for the year ended 31 October 2008 were audited by KPMG. KPMG are the present auditors of Eimskip. As a consequence of Iceland being party to the agreement on the European Economic Area, the financial statements are presented in accordance with IFRS as implemented by the European Union; there may be differences between the way in which they are presented and the presentation of financial statements in public filings in other jurisdictions.

No person has been authorised to make any representations on behalf of Eimskip concerning the Petition which are inconsistent with the statements contained herein and any such representations, if made, may not be relied upon as having been so authorised.

Nothing contained in this Document shall constitute a warranty or guarantee of any kind, express or implied, and nothing contained herein shall constitute any admission of any fact or liability on the part of Eimskip, the Eimskip Group or New Eimskip (or any of their affiliates) with respect to any asset to which it or they may be entitled or any claim against it or them.

Creditors should not construe the contents of this Document as legal, tax or financial advice, and should consult with their own advisers as to the matters described herein.

1.      DEFINITIONS AND INTERPRETATION

1.1     Definitions

In this Document, unless the context otherwise requires or otherwise expressly provided for, the following expressions shall bear the following meaning:

AAAE means Air Atlanta Aero Engineering Ltd.

**ABN** means ABN Amro Bank N.V. London Branch

**Act on Bankruptcy 1991** means the Icelandic Act on Bankruptcy, etc. No. 21/1991

**Americold** means Americold Realty Trust. whose registered office is 10 Glenlake Parkway, South Tower Suite, 800, Atlanta, Georgia 30328-7250, United States

**Bonds** means, together, bonds issued by Eimskip as listed on the Nasdaq OMX Nordic Exchange Iceland with AVION06 1, AVION06 2 and EIM04 1 and the unlisted bonds HFEIM08 1, HFEIM07 1 and HFEIM07 2

**Chinese Portal Authority** means Qingdao Port (Group) Limited

**Composition Agreement** means an agreement on the settlement of debt concluded between Eimskip and a certain majority of its creditors on the terms specified in the Composition Proposal

**Composition Claims** means those claims of the creditors of Eimskip as set out in Table 10

**Composition Order** means a confirmation of the Composition Agreement by the District Court of Reykjavik, which has not been appealed within one week from issuance as specified in Article 59 of the Act on Bankruptcy 1991 and which has become final pursuant to Article 60 of the Act on Bankruptcy 1991 or, if such confirmation has been appealed, a final court resolution by the Supreme Court of Iceland approving the Composition Agreement

**Composition Payments** means shares in New Eimskip in respect of Composition Claims due to creditors as set out in the Composition Order

**Composition Period** means the period from: (i) the date on which the District Court of Reykjavik, by a court order, grants a licence to seek composition with creditors in connection with the Petition; to (ii) the date of the Composition Order

**Composition Proposal** means the composition proposal contained in the Petition and as further set out in Section 4

**Containerships** means Containerships Limited Oy, a limited liability company registered in Finland (registered number 0818358-5) whose registered office is at Mannerheimintie 15 B 00260, Helsinki, Finland

**Containerships Group** means Containerships and its subsidiaries

**Daalimpex** means Daalimpex Beeher B.V., a limited liability company registered in the Netherlands (registered number 37039660) whose registered office is at Postbus 3045, 2001 DA Haarlem, in Administration

**Document** means this explanatory memorandum and its Appendices

**EBITDA** means earnings before interest, tax, depreciation and amortisation

**Eimskip** means Hf. Eimskipafelag Islands, a public limited liability company registered in Iceland (registered number 660288-1049) whose registered office is at Korngardar 2, 104 Reykjavik, Iceland

**Eimskip Board** means the Board of Directors of Eimskip

**Eimskip-CTG** means Eimskip-CTG AS, a limited liability company registered in Norway (registered number 937 019 661) whose registered office is at P.O. Box 13 N 8401, Sortland, Norway

**Eimskip Group** means Eimskip and its subsidiaries

**Eimskip Tango** means Eimskip Tango ehf a private limited liability company registered in Iceland (registered number 701205-2350) whose registered office is at Korngadar 2, 104 Reykjavik, Iceland

**Eksportfinans** means Eksportfinans ASA a limited liability company registered in Norway, (registered number 816 521 432) whose registered office is at PO Box 161, Vika 0119 Oslo, Norway

**Entity Priority Model** or **EPM** means the financial model, which models the returns to creditors in the event of a hypothetical bankruptcy scenario, as set out in Appendix 5

**Euro Container Line** means Euro Container Line AS a limited liability company registered in Norway (registered number 981 073 770) whose registered office is at Bradbenken 1, Bergen, Norway

**Freshport** means Freshport BV (registered number 34185555 0000) whose registered office is Pelikaanweg 201, 1118DW, Luchthaven, Schiphol, Amsterdam

**FY09** means the financial year for the period from 1 November 2008 to 31 October 2009

**FY09 Business Plan** means the business plan adopted by the board of directors of Eimskip for the Eimskip Group (with the exception of Versacold and the Containerships Group) for FY09

**FY10** means the financial year for the period from 1 November 2009 to 31 October 2010

**FY11** means the financial year for the period from 1 November 2010 to 31 October 2011

**FY12** means the financial year for the period from 1 November 2011 to 31 October 2012

**HiveCo** means Eimskip Ísland ehf. (registration number 421104-3520), a company incorporated in Iceland as a private limited liability company and wholly owned by Eimskip for the purpose of acquiring certain operating assets and liabilities of Eimskip

**Innovate** means Innovate Logistics Limited, a limited liability company registered in the United Kingdom (registered number 02058414) whose registered office is at BDO Stoy Hayward LLP, 55 Baker Street, London, W1U 7EU, in Administration

**ISK** means Icelandic Krona

**Islandsbanki** means Islandsbanki hf, formerly New Glitnir (registered number 491008-0160) whose registered office is at Kirkjusandur 2, 155 Reykjavik, Iceland

**KingSett / SITQ** refers to the respective funds KingSett Real Estate Growth LP No. 2 and SITQ Industriel 3III Inc whose registered office is at BCE Place, Canada Trust Tower, 161

Bay Street, Suite 3140, Po Box 204, Toronto, Ontario, M5J 2S1, Canada or their respective successors and assigns

**Landsbanki** means Landsbanki Islands hf (registered number 540291-2259) whose registered office is at Austurstraeti 16, 155 Reykjavik, Iceland

**Lessors** means Islandsbanki, SP fjarmognun hf and Lysing hf

**Letter Agreement** means the letter agreement between Eimskip, Yucaipa, New Eimskip and HiveCo entered into on 29 June 2009

**New Eimskip** means L 1003 ehf (registered number 690409-0460) (to be renamed Eimskipafelag Islands ehf) a company incorporated in Iceland as a private limited liability company which is to acquire the Transfer Subsidiaries

**New Eimskip Group** means New Eimskip and the Transfer Subsidiaries

**New Eimskip Restructuring Steps** means the steps plan in relation to the restructuring of the business and operations of the Eimskip Group as described in Section 4.2(b)

**NIB** means Nordic Investment Bank whose registered office is at PO Box 249, FI-00171, Helsinki, Finland

**Nordea** means Nordea Bank Norge ASA (registered number 911 044 110) whose registered office is at Middelthunsgate 17, 0368 Oslo, Norway

**Petition** means a petition for a licence to seek composition with the creditors of Eimskip in the manner described in this Document

**Petition Date** means the date of the filing of the Petition, being [   ] July 2009

**Qingdao Cold Storage Facility** means Qingdao Eimskip Cold Storage Co. Limited

**RCF** means the €300,000,000 secured revolving credit facility dated 28 June 2007 between (i) Eimskip; and (ii) ABN and the other parties thereto as amended, modified and restated to the date of the Petition

**Samson** means Samson eignarhaldsfelag ehf (registered number 490902-2520) whose registered office is at Adalstraeti 6, 101 Reykjavik, Iceland

**Standstill Agreement** means any agreement entered into between Eimskip and a creditor setting out the terms for a cessation of payments for a defined period

**Straumur** means Straumur-Burdarás Investment Bank hf. (registered number 701086-1399)

**Subsidiary** means, in relation to any entity (the *first entity*), any other entity and which is consolidated in the accounts of the first entity in accordance with accounting principles generally accepted in the jurisdiction of incorporation of the first entity

**Supporting Creditors** has the meaning given to it in the "Important Notice to Creditors" in this Document

**Total Eimskip Claims** means the estimate set forth by Eimskip as the total claims against Eimskip as at the Petition Date

**Transfer Subsidiaries** means the direct and indirect subsidiaries of Eimskip other than Versacold

**Versacold** means Eimskip Tango and its subsidiaries

**Versacold Loan Receivable** means the receivable in favour of Eimskip owing by Versacold Logistics Canada Inc. to Eimskip arising under a loan indenture dated 2 November 2006 by and among Versacold Logistics Canada Inc., Eimskip and the other parties thereto, as amended, modified and restated to the date of the Petition

**Versacold Logistics Canada Inc.** means Versacold Logistics Canada Inc (registered number 6593940) whose registered office is 5255 Yonge Street, Suite 900, Toronto, Ontario, M2N5P8, Canada

**Voting Claims** means those Composition Claims that are assumed to be eligible to vote on the Composition Petition (as further described in Section 4.5)

**XL** means XL Leisure Group PLC, a limited liability company registered in England and Wales (registered number 04513359) whose registered office is at Kroll Ltd, Wellington Plaza, 31 Wellington Street, Leeds, West Yorkshire, LS1 4DL, in Administration

**XL Lessors** means the owners and lessors of aircraft leased by XL or subsidiaries of XL

**Yucaipa** means The Yucaipa Companies LLC, whose registered office is 9130 West Sunset Boulevard, Los Angeles, California, 90069 and/or, where the context does not permit, its affiliates

**Yucaipa Transaction** means the transaction set out in Section 2.2(d)

## 1.2    Interpretation

In this Document, unless the context otherwise requires or otherwise expressly provides for:

1.2.1    references to Sections, Tables, Figures and Appendices are references to sections, tables, figures and appendices respectively of this Document;

1.2.2    references to a statute or a statutory provision include the same as subsequently modified, amended or re-enacted from time to time;

1.2.3    references to (or in any specified provision of) this Document or in any other document shall be construed as references to this Document, that provision or that document as in force for the time being;

1.2.4    the singular includes the plural, and vice versa, and words importing one gender shall include all genders; and

1.2.5    headings are for ease of reference only and shall not affect the interpretation of this Document.

## 2.    STATUS OF PETITIONER

### 2.1    Background to the business

(a)    Eimskip Group

The Eimskip Group is a shipping, transportation and logistics company with its headquarters in Iceland and operations around the globe.   The Eimskip Group comprises approximately 120 entities incorporated in a number of jurisdictions.

The Eimskip Group mainly operates in three markets:

- shipping and transportation;
- freight forwarding and logistics; and
- cold storage.

Shipping and Transportation

The shipping and transportation businesses are focussed on Northern Europe with operations serving Iceland, the Faroe Islands, Norway and other Northern European countries.   The businesses also operate a North Atlantic route linking Iceland and the USA/Canada.  Eimskip recently disposed of its interests in Containerships, a shipping and transportation business based in Finland.

Freight Forwarding and Logistics

The freight forwarding and logistics businesses operate in Iceland, the USA/Canada, the Faroe Islands, Norway, Continental Europe, Scandinavia and a number of countries in Asia.

Cold Storage

The Eimskip Group's principal cold storage business is Versacold, which has its headquarters in Canada and operations in North America, South America and Australasia.   The Eimskip Group also operates several cold storage facilities separate from Versacold in Iceland, the Faroe Islands, Norway and Qingdao, China.

Eimskip has sold 49% of Eimskip Tango (the holding company of Versacold) to Yucaipa and has granted Yucaipa an option to acquire the remaining 51% of Eimskip Tango.

As part of the arrangements with Yucaipa, Eimskip has also agreed to sell the Qingdao Cold Storage Facility in China to an affiliate of Americold, a Yucaipa portfolio company. The sale is conditional on a number of items including, in particular, the renegotiation of a capital lease to the buyer's satisfaction.

Following these transactions, the Eimskip Group will operate significantly fewer cold storage facilities, the remaining nine integrated into its shipping and logistics businesses in Iceland, Faroe Islands and Norway.

(b)     Eimskip

Eimskip is the petitioner in the Petition.

Eimskip is the ultimate parent company of the Eimskip Group. An Eimskip Group structure chart is set out in Appendix 1.

Eimskip has also been the principal source of funding for the Eimskip Group and is the borrower or guarantor of a significant proportion of the Eimskip Group debt.

In addition to being the parent of the Eimskip Group, Eimskip has been, until recently, the operating company of the Eimskip Group's Icelandic shipping and transportation businesses.

(c)     Acquisitions

Since 2005, Eimskip has made a number of acquisitions to expand its core shipping and transportation businesses across Europe and to expand its cold storage business.   Table 1 shows acquisitions of the Eimskip Group since 2005:

Table 1 – Group Acquisitions since 2005

| Date | Target | Stake | Notes |
|------|--------|-------|-------|
| July-05 | Halship | 51% | Canadian short sea line |
| July-05 | P/F Heri Thomsen Transport Service | 100% | Faroese road and sea transport business |
| October-05 | Icelandic Group | 10% | Seafood exporting group |
| February-06 | Star Airlines | 100% | Continental charter carrier; became XL France |
| March-06 | Innovate Holdings | 50% | UK temperature controlled cargo carrier |
| April-06 | Farmaleiðir | 100% | Faroese road transport business |
| September-06 | Kursju Linija | 100% | Lithuanian shipping line |
| September-06 | Containerships | 65% | Baltic door-to-door transport provider |
| October-06 | Corby Chilled Distribution | 100% | Temperature controlled primary food distribution |
| November-06 | Pacific Tramper Services | 100% | Reefer tramping services |
| November-06 | Atlas Cold Storage Income Trust | 100% | Canadian cold storage and distribution |
| November-06 | Qingdao Cold Storage | JV | Agreement to build the largest coldstore in China |
| January-07 | Daalimpex | 100% | Netherlands cold storage chain |
| June-07 | Innovate Holdings | 100% | UK temperature controlled cargo carrier |
| August-07 | Versacold Income Fund | 100% | Global cold storage and distribution |

The financing of these acquisitions has contributed significantly to the overall indebtedness of the Eimskip Group.

(d)     Significant Challenges in 2008

In 2008, Eimskip faced a number of significant set-backs which resulted in Eimskip being unable to meet interest and amortisation payments on its debt in the second half of 2008:

- The financial support provided by Eimskip to Innovate, its UK cold storage business, prior to Innovate filing for Administration in May 2008 significantly reduced cash resources.

- Eimskip was exposed to significant guarantee claims following the insolvency of a former subsidiary, XL Leisure Group plc, in September 2008.

- The economic crisis in Iceland and global recession causing revenues to fall.

**2.2    Restructuring process and asset disposals**

(a)    Restructuring Programme

As a consequence of Eimskip's acquisition policy and the significant set-backs faced in 2008, Eimskip became heavily over-indebted.

The Eimskip Board announced a restructuring programme in September 2008. The restructuring programme involved the planned disposal of certain businesses and assets, most notably Versacold. Following these planned disposals, Eimskip intended to consolidate the Eimskip Group's operations around the core shipping, transportation and logistics businesses.

(b)    Disposal Programme

Eimskip actively marketed the following businesses and assets as part of the restructuring programme:

- Versacold

- Certain vessels which are subject to pledges held by providers of vessel finance

- Property and land in Reykjavik

- Daalimpex, a cold storage business in The Netherlands

- Its 65% shareholding in Containerships, a shipping and transportation business in Finland

- Its 50% shareholding in Euro Container Line

- The Qingdao Cold Storage Facility

- Its 50% shareholding in Freshport, a specialist storage business in the Netherlands

- AAAE, an aircraft engineering business in Ireland

By far the largest proposed disposal was of Versacold. Eimskip, advised by two international investment banks, began a formal sale process of Versacold in September 2008.

The large lease obligations borne by Versacold following several sale and leaseback transactions completed in late September 2007 and January 2008, combined with prevailing conditions in the global financial markets, severely impacted the Versacold sale process. The final offers received valued Versacold at less than the third-party debt it carried

(approximately €570m) and no proceeds of sale would have been available to Eimskip as equity holder had the best offer been accepted.

(c)      Standstill Agreements

In October 2008, with the world economic position worsening rapidly and an unprecedented financial markets crisis in Iceland, Eimskip requested forbearance from its financial creditors to provide the liquidity required to continue to operate its businesses until the realisation of sale proceeds from the disposal programme.

Eimskip signed formal Standstill Agreements with a number of key creditors and agreed de facto standstill arrangements with other major financial creditors.

(d)      Yucaipa Transaction

Yucaipa (a US based private equity firm) emerged as the highest bidder for Versacold but the proposed purchase price offered by Yucaipa was not sufficient to repay secured creditors of Eimskip as a precursor to restructuring. In order to address these issues Yucaipa expressed an interest in acquiring material minority interests in Versacold and the operating businesses of the Eimskip Group as part of a wider transaction.

Yucaipa is a private equity firm that specialises in investing in and operating retail, consumer product, distribution, logistics, transportation, hospitality and manufacturing businesses. Founded in 1986, Yucaipa has completed mergers and acquisitions valued at more than US$30 billion. Over the last 23 years, Yucaipa has established a successful track record of acquiring, integrating and increasing the cash flow of companies it controls or manages. This has resulted in Yucaipa producing substantial returns on its realised investments.

The Eimskip Board concluded that Yucaipa's approach potentially represented a substantially better outcome for Eimskip and its creditors than the alternatives available and therefore entered into a period of negotiation exclusivity with Yucaipa.

Eimskip and Yucaipa have recently entered into the Letter Agreement pursuant to which Eimskip and Yucaipa have (i) concluded a transaction involving the sale of Eimskip's interest in the Versacold Loan Receivable, the sale of a 49% minority interest in Eimskip Tango and the grant of an option to acquire the remaining 51% of Eimskip Tango and (ii) reached agreement on the proposed acquisition by Yucaipa, subject to the Composition Order, of a minority stake in New Eimskip which will acquire, through the acquisition of the Transfer Subsidiaries, Eimskip's core shipping, transportation and logistics business, operations and assets other than the remaining 51% of Eimskip Tango.

Prior to concluding the first stage of the investment in Versacold (through the purchase of a 49% interest in Eimskip Tango), Yucaipa acquired the debt under the RCF from ABN.

This transaction is described more fully at Section 4 of this Document.

(e)      Other Disposals

The realisable values of vessels and Icelandic property have been severely impacted by global and Icelandic economic conditions. Table 2 provides a summary of the status of the various proposed disposals of businesses and assets under the disposals programme.

Table 2 – Summary of disposal processes

| Asset | Status | Price |
|---|---|---|
| Eimskip Tango | 49% Sold<br>51% call option granted | See transaction description at Section 4.1(b) |
| Versacold Loan Receivable | Sold | See transaction description at Section 4.1(b) |
| Euro Container Line | Sold | €7 million |
| Vessels MV Storfoss, MV Dalfoss and MV Langfoss | Sold | Value of secured debt |
| Property and Land in Reykjavik | Sold | €1.2m above debt |
| Daalimpex | In Administration | Below secured debt |
| Containerships | Sold | €23m to secured lender |
| Qingdao Cold Storage Facility | Subject to a conditional sale agreement | Value of debt |
| Freshport | Sale process on hold | Negligible |

Once the Eimskip Group has completed these disposals debt will reduce by approximately €712m but they will deliver limited cash to Eimskip in view of the security over the assets that have been sold.

A consequence of these disposals is that Eimskip Group is now a business focussed on shipping, transportation and logistics.

The Eimskip Board believes that the remaining shipping, transportation and logistics businesses contain more value in their entirety than would be achieved by further piecemeal disposals.

**2.3   Forecast business performance**

FY09 Business Plan and Preliminary Projection for FY10

Eimskip's business strategy is to retrench operations and focus upon becoming a market leader in North Atlantic shipping and global reefer logistics.

In January 2009, Eimskip finalised the FY09 Business Plan for the Eimskip Group. This plan showed a forecast EBITDA of €32m for FY09.

During May 2009 Eimskip updated the FY09 Business Plan to reflect both (i) actual trading performance in the first half of the financial year and (ii) a developed outlook for the balance of the period. This updated projection shows €34m EBITDA for FY09.

Shipping markets remain extremely fragile and the Eimskip Group's currently distressed financial position has weakened its competitive position. In addition, the ongoing restructuring programme has involved significant cost in relation to legal and other advisers. From 1 November 2008 until 31 May 2009 Eimskip has incurred approximately €3.2 million of costs relating to its restructuring programme, consisting mostly of professional and legal costs. These costs are considered to be atypical and are not expected to reoccur. Accordingly, the actual outcome for FY09 remains highly uncertain. The updated projection includes these costs.

Table 3 provides a summary of key projections contained in the updated FY09 Business Plan.

Table 3 – FY09 Business Plan (key projections)

|  | Iceland €m | Europe €m | Asia €m | Americas €m | Corporate €m | Total €m |
|---|---|---|---|---|---|---|
| Revenue | 200.3 | 230.9 | 75.2 | 12.0 | 1.5 | 520.0 |
| Expenses | (170.9) | (216.3) | (72.1) | (11.1) | (15.6) | (486.0) |
| EBITDA | 29.5 | 14.7 | 3.1 | 0.9 | (14.1) | 34.0 |

A preliminary projection for FY10 has recently been developed and a formal budget for FY10 will be prepared later in the year.

The EBITDA performance of the business in FY10 is projected to be materially better than that of FY09. This is primarily due to a significant improvement in FY10 first quarter (the first quarter of FY09 was severely impacted by the crisis in the Icelandic economy) and by elimination of costs associated with restructuring the business.

Table 4 provides a high level summary of the year-on-year development in projected performance.

Table 4 – Summary of FY09 and FY10 Projections[1]

| | Revenue | | | EBITDA | |
|---|---|---|---|---|---|
| | FY09 | FY10 | | FY09 | FY10 |
| | €m | €m | | €m | €m |
| Iceland | 200.3 | 206.4 | | 29.5 | 34.5 |
| Europe | 230.9 | 231.8 | | 14.7 | 13.8 |
| Asia | 75.2 | 74.7 | | 3.1 | 2.3 |
| Americas | 12.0 | 12.3 | | 0.9 | 0.9 |
| Corporate | 1.5 | 1.5 | | (14.1) | (12.3) |
| Total | 520.0 | 526.7 | | 34.0 | 39.2 |

[1] These are unconsolidated revenues and expenses, including intercompany transactions.

## 2.4    Assets and Liabilities

(a)    Consolidated Balance Sheet

The consolidated accounts for the Eimskip Group as at 31 January 2009 are set out in Appendix 3. Net liabilities of €174.5m are shown as at 31 January 2009.

(b)    Eimskip Balance Sheet

The individual company balance sheet for Eimskip as at 31 January 2009 is set out in Appendix 4 and shows net liabilities of €81.1m.

(c)    Eimskip Creditors

Table 5 provides a list of the creditors of Eimskip as at 31 January 2009.

Table 5 – Eimskip Creditors as at 31 January 2009

| Creditor | Facility | Current Loans and Borrowings (€m) | Non Current Loans and Borrowings (€m) | Trade and Other Payables (€m) | Total Debt as at 31 January 2009 (€m) |
|---|---|---|---|---|---|
| Landsbanki | Term loan | 30.4 | 118.0 | 0.9 | 149.3 |
| Landsbanki (Samson Claim) | Guarantee claim | - | - | 210.8 | 210.8 |
| Landsbanki | Property mortgages | 0.7 | 16.8 | 0.3 | 17.8 |
| Samson | Term loan | - | 21.3 | 2.4 | 23.7 |
| Bonds | Bonds | 175.0 | - | 6.5 | 181.6 |
| Straumur | Term loan / SWAP | 73.7 | (5.4) | 1.4 | 69.7 |
| KingSett / SITQ | Convertible bond | - | - | 10.3 | 10.3 |
| Nordea | Equipment loan | 0.5 | 0.5 | 0.0 | 1.1 |
| Eksportfinans | Vessel mortgage | 3.4 | 4.2 | 0.2 | 7.7 |
| Lessors | Finance leases | 6.3 | 13.1 | - | 19.4 |
| XL Lessors | Guarantee claim | - | - | 13.5 | 13.5 |
| Islandsbanki | Property mortgages | 20.3 | 12.1 | 1.1 | 33.6 |
| Nordic Investment Bank | Property mortgages | 6.2 | 7.8 | 0.8 | 14.8 |
| ABN | Revolving credit facility | 140.5 | - | 0.1 | 140.6 |
| Trade Creditors | Trade credit | - | - | 16.1 | 16.1 |
| Other | Loan Fee | (1.0) | (0.2) | - | (1.2) |
| Total | | 456.1 | 188.3 | 264.4 | 908.8 |

Please note the above balance sheet excludes any liabilities relating to the Qingdao Cold Storage Facility.

(d)    Security granted by Eimskip

Eimskip has granted security in favour of certain financial creditors listed in Table 5 as follows:

- **Share pledges** were granted by Eimskip over certain companies within the Eimskip Group in respect of Eimskip's obligations under the RCF (Yucaipa is now the sole creditor under the RCF). This security, formerly held by ABN, represented the most significant challenge to the restructuring of Eimskip. The package of security is summarised in Appendix 1.

- **Property mortgages** have been granted over certain Eimskip properties in Iceland in favour of Landsbanki, Islandsbanki and NIB.

- **Receivables pledge** over receivables of Eimskip has been granted by Eimskip in favour of Landsbanki.

(e)     Contingent Liabilities

Eimskip has a number of contingent liabilities relating to pending litigation and possible claims under guarantees issued by Eimskip in support of subsidiary company borrowings, obligations of subsidiaries to customers, real estate leases and aircraft lease obligations of former members of the Eimskip Group.

The gross value of these contingent liabilities is in excess of €900 million, although it is expected that actual liabilities arising from any claims will be significantly lower.

3.      **HYPOTHETICAL BANKRUPTCY**

(a)     Inability to Meet All Obligations

Eimskip reported €909m of total liabilities to financial and non-financial creditors as at 31 January 2009 (see Table 5). Total liabilities of Eimskip are an estimated €871m as at the Petition Date, including the lease liabilities relating to the Qingdao Cold Storage Facility.

Since October 2008 Eimskip has not been servicing its borrowings as agreed with or acquiesced in by financial creditors under the Standstill Agreements and de facto standstill arrangements. But for these arrangements, Eimskip would be unable to meet its debts as they fall due and would need to file for liquidation. This section considers the returns in liquidation and is followed by a section detailing the improved returns offered by this Composition Proposal.

(b)     Estimate of Liquidation Returns

The return to creditors in a hypothetical liquidation has been derived from an Entity Priority Model (or EPM) which has been prepared by Eimskip with assistance from its advisers.

Based on a number of core assumptions, the EPM estimates the likely outcome of a liquidation of each entity within the Eimskip Group and estimates the distributions that would

be paid to creditors in each entity according to the priority of claims in each jurisdiction. Appendix 5 explains the EPM methodology and the assumptions used.

The key assets that would be realised on a liquidation of Eimskip and its subsidiaries are:

- Intercompany Receivables

- Vessels

- Property

- Other Equipment

- Cash

As shown in Table 6 below, the estimated outcome for unsecured creditors in a hypothetical liquidation shows a return of only 2.1%.

Table 6 – Returns to unsecured creditors in a hypothetical liquidation scenario

Estimated realisations from amounts not subject to security

|  | €m |
|---|---|
| Land and buildings | 3.5 |
| Equipment | 3.7 |
| Cash | 10.3 |
| Intercompany receivables | |
| Sale of vessels | 18.2 |
| Other | 5.3 |
| Other assets | 1.4 |
| | 42.4 |
| Priority Claims | (5.0) |
| Costs of bankruptcy | (10.0) |
| | 27.4 |
| Estimate of total unsecured creditors | (912.2) |
| Recovery for unsecured creditors | 3.0% |
| Adjusted to reflect delay in making distribution | 2.1% |

The key conclusions from this analysis are as follows:

- The majority of value within the subsidiaries of Eimskip would be distributed to creditors of those subsidiaries and thereafter lenders holding share pledges over those subsidiaries.

- The property assets in Eimskip are valued at considerably less than the related outstanding secured loans.

- Key value drivers for unsecured creditors are the cash held by Eimskip and the vessels which have not been pledged to lenders, where disposal proceeds would be paid to Eimskip via repayment of inter-company accounts. Eimskip would also benefit from surplus realisations from the sale of two vessels that would be expected to sell for more than the debt outstanding and secured against them.

- It is likely that it would take several years before any funds would be distributed to unsecured creditors in a liquidation scenario. Accordingly, returns estimated above have been adjusted to account for an estimated four year delay in distributions from the date of liquidation.

## 4.   COMPOSITION PROPOSAL

Eimskip has entered into the Letter Agreement with Yucaipa. The Letter Agreement covers a linked series of transactions, several of which have already been completed and others of which are anticipated. Under this series of transactions, the outcome for the unsecured creditors of Eimskip should be materially better than would be expected in liquidation.

The Letter Agreement requires Eimskip to enter into a Composition Agreement with its unsecured creditors whereby those creditors convert their debt in Eimskip into a 54.1% shareholding in New Eimskip, the entity which will purchase the core shipping, transportation and logistics businesses of the Eimskip Group (but not including, for the avoidance of doubt, Versacold) with approximately 3% from that shareholding being allocated for contingent claims against Eimskip (in other words, 51.1% is being allocated to known unsecured creditors and 3% to contingent claimants).

The Letter Agreement contemplates a series of transactions that involves (i) certain steps which have already occurred prior to the filing of the Petition; (ii) steps that are conditional upon the issue of a Composition Order; and (iii) steps that will occur after the issue of a Composition Order. Each of the key steps is set out below:

### 4.1   Pre-Composition Steps

Each of the pre-composition steps has already occurred as follows:

(a)     ABN Debt Acquisition

On 30 June 2009, Yucaipa acquired ABN's interest in the RCF. The amount of principal and interest outstanding under this facility was approximately €120m.

(b)     The Versacold Transaction

On 30 June 2009 Eimskip sold 49% of the shares in Eimskip Tango, the parent company of Versacold, to Yucaipa. The transaction also involved (i) the purchase by Yucaipa of an

option for Yucaipa to acquire the remaining 51% of Eimskip Tango and (ii) the purchase by Yucaipa of the €109m Versacold Loan Receivable. Eimskip also contributed a €5.2m inter-company receivable to Eimskip Tango as share capital.

Consideration paid by Yucaipa for the various interests in Versacold (i) were the surrender of €75m of the principal amount of the RCF plus all then accrued interest and (ii) will be the surrender of €5m of the principal amount of the RCF on the exercise of the option to acquire the remaining 51% of Eimskip Tango.

(c)     Agreement to Sell Qingdao Cold Storage Facility

On 29 June 2009 Eimskip agreed to sell the Qingdao Storage Facility in China to an affiliate of Americold. The sale is conditional on a number of items including, in particular, the renegotiation of a capital lease to buyer satisfaction.

(d)     Agreements with Secured Lenders

The claims of a number of creditors who hold security are excluded from the Composition Agreement. Prior to filing this Document, Eimskip reached commercial agreement with certain of its secured lenders and these agreements are summarised in Appendix 6.

(e)     Hive Down of Icelandic Operations

Eimskip has entered into an agreement concerning the transfer of receivables and payables (the "Trade Transfer") and a service agreement (the "Service Agreement") with HiveCo. Under the Trade Transfer, Eimskip transferred its trade payables and receivables (as set out in appendices to the Trade Transfer) to HiveCo and under the Services Agreement Eimskip has agreed to provide HiveCo with services necessary to collect trade receivables and discharge trade payables in consideration of service charges. The Trade Transfer and the Service Agreement have been entered into to allow the Icelandic operation of the Eimskip Group to continue to trade during the Composition Period.

The core shipping and transportation business of Eimskip will be transferred to HiveCo following the issue of the Composition Order as described below in Section 4.2(b).

(f)     Letter of Credit Arrangements

Yucaipa has procured the issue of two letters of credit in the aggregate amount of €15m. These will be released to New Eimskip as an equity capital contribution as set out in Section 4.2(a).

**4.2     Steps conditional on the Composition Order**

Subject only to the Composition Order being made, the consent of Icelandic port authorities to the transfer of certain port site lease agreements to HiveCo, the transfer to HiveCo of certain licences relating to tax free zones in warehouses and anti-trust clearance in Iceland, the following shall occur on the same date:

(a)     Capitalisation of New Eimskip

The letters of credit will be drawn in full and will represent a €15m equity capital contribution by Yucaipa to the share capital of New Eimskip. The bylaws of New Eimskip which will be in place at the date of this drawdown are set out in Appendix 7.

(b)     New Eimskip Restructuring Steps

Eimskip will transfer to HiveCo (i) all right, title and interest in and to the business, assets and properties of Eimskip (other than its shareholdings in members of the Eimskip Group and interests in certain agreements which are to stay with Eimskip to facilitate other aspects of the steps outlined in this Section 4, notably the RCF and the sale and call option arrangements in respect of Eimskip Tango) and (ii) certain prescribed liabilities (to secured creditors and under contracts being transferred).  If for any reason the full legal right, title and interest to any of the business or assets of Eimskip is not capable of immediate transfer to HiveCo, Eimskip shall hold the beneficial interest thereof on behalf of HiveCo and Eimskip shall transfer to New Eimskip that part of the business or assets as soon as practicable thereafter.

Eimskip will:

(i)     transfer to New Eimskip all rights, title and interest to the shares in the Transfer Subsidiaries free and clear of any encumbrances (other than those being released immediately after the transfer by Yucaipa as described below);

(ii)    transfer to New Eimskip all rights, title and interest of Eimskip in receivables owing from the Transfer Subsidiaries; and

(iii)   subject to any requirements of law, enter into an arrangement with New Eimskip under which (x) the shares issued to satisfy the claims of contingent creditors of Eimskip are issued to Eimskip subject to an encumbrance in favour of New Eimskip (y) Eimskip agrees to distribute those shares to creditors whose rights crystallise in accordance with an agreed procedure and (z) those shares which are not so distributed are transferred back to New Eimskip on the earliest to occur of the contingent claims lapsing, the shareholders of Eimskip deciding to liquidate Eimskip and a bankruptcy of Eimskip,

whereupon New Eimskip will issue 10.82m (54.1% of issued share capital) of the shares in New Eimskip in the manner described in Section 4.2(c).

Landsbanki will release its security over receivables of HiveCo, whereupon New Eimskip will issue shares to Landsbanki in the amount of 2.72m (13.6% of issued share capital) of the shares in New Eimskip.

Yucaipa will:

(i)     deliver to Eimskip a release in respect of approximately €40 million of principal under the RCF plus all then accrued interest thereon;

(ii)    release all of the Transfer Subsidiaries which are guarantors under the RCF from those guarantees; and

(iii)   release all security granted under the RCF other than the security over the Eimskip Tango shares,

whereupon New Eimskip will issue shares to Yucaipa in the amount of 4.68m (23.4% of the issued share capital) of the shares in New Eimskip.

All consideration from New Eimskip will consist of shares in New Eimskip and the holdings in New Eimskip will be as follows immediately after completion of the step described above:

Table 7 – New Eimskip Equity Allocation

| | Consideration | | Initial Subscription | | Shareholding immediately after Composition | |
|---|---|---|---|---|---|---|
| | Number (m) | Percentage | Number (m) | Percentage | Number (m) | Percentage |
| Yucaipa | 4.68 | 23.4% | 1.78 | 8.9% | 6.46 | 32.3% |
| Secured Landsbanki | 2.72 | 13.6% | - | - | 2.72 | 13.6% |
| Unsecured creditors[1] | 10.82 | 54.1% | - | - | 10.82 | 54.1% |
| | 18.22 | 91.1% | 1.78 | 8.9% | 20.00 | 100.0% |
| [1]Of which Landsbanki | | 32.4% | | | | 32.4% |
| Total Landsbanki holding | | 46.6% | | | | 46.6% |

(c)   Composition of Eimskip Creditors

The 10.82m (54.1% of the outstanding share capital) shares in New Eimskip which will be the consideration for the purchase of the Transfer Subsidiaries will be delivered or held for delivery (i) pro-rata to the unsecured creditors of Eimskip and (ii) for the contingent claimants. Approximately 3% of the shareholding in New Eimskip will be retained by Eimskip to satisfy any contingent claims which crystallise (subject to the arrangement with New Eimskip described in Section 4.2(b) above).

Following receipt of shares in New Eimskip, unsecured creditors of Eimskip will have no claims against New Eimskip or Eimskip with respect to their Composition Claims.

**4.3    Post Composition Steps**

(a)   Cash Payment Offer to Creditors

The Eimskip Board recognises that some unsecured creditors of Eimskip may prefer to receive a cash distribution for their claims rather than equity in New Eimskip.

Although not part of the Composition Proposal, in order to facilitate this preference, up to €10m of cash in New Eimskip will be made available by New Eimskip to buy back shares via a self tender. Shareholders will be given the option to tender some or all of their shares for cash on a pro-rata basis. The terms of the tender are contained in the bylaws of New Eimskip set out in Appendix 7. Yucaipa has agreed that it will not tender any of its shares and Landsbanki has agreed that it will not tender any of its shares to the extent received in consideration of its release of its pledge over receivables in HiveCo.

If the €10m self tender is not fully subscribed, the balance of funds not used to repurchase shares will be retained by New Eimskip as cash and used for general corporate purposes, including working capital.

### 4.4    Estimated Financial Outcome for Unsecured Creditors of Eimskip

Given that returns for the unsecured creditors of Eimskip will take the form of shares in New Eimskip, the estimated financial outcome for the unsecured creditors is driven by the value attributed to New Eimskip.

Set out at Appendix 8 is a summary of the financial projections of New Eimskip, together with other matters of relevance in assessing value.

A summary valuation is set out in Table 8 below. This indicates that the aggregate value of shares to be transferred to Eimskip for the satisfaction of composition claims is €90.8m.

Table 8 –  Summary Valuation of New Eimskip

| New Eimskip Equity Valuation | €m |
|---|---|
| FY10E EBITDA | 39.2 |
| Valuation Multiple | 6x |
| Enterprise Value | 235.3 |
| New Eimskip Debt | |
| - "Hive Co" | (68.8) |
| - Other Subsidiaries | (29.7) |
| Cash in group | 31.0 |
| Equity Value | 167.8 |
| Value of 54.1% | 90.8 |
| Estimate of composition claims | 766.2 |
| **% return to unsecured creditors** | **11.9%** |

Key assumptions used to arrive at the estimated value of shares in New Eimskip are as follows:

- Cash in group includes the €15m equity investment to be made by Yucaipa as described above. (Note that while up to €10m of this may be used to buy back shares as anticipated in Section 4.3(a), the incremental proportionate increase in percentage shareholding of shareholders will ensure that the self tender is not dilutive to the value of non-tendering shareholder positions).

- Forecast EBITDA for FY10 has been used as the basis for calculating value. Given the extraordinary events that have impacted EBITDA in FY09, Eimskip considers that forecast EBITDA for FY10 is more representative of the sustainable earnings of the ongoing business.

- In view of trading multiples for comparable shipping and logistics companies over a period of several years, Eimskip believes that an EBITDA multiple of 6 is a reasonable long term valuation multiple.

- The Qingdao Cold Storage Facility is not part of the New Eimskip Group.

Table 9 sets out the proposed equity distribution of shares in New Eimskip.

Table 9 – New Eimskip Equity Distribution

| Breakdown of Creditor Returns | | €m |
|---|---|---|
| Landsbanki | | |
| - secured lender | 13.6% | 22.8 |
| - unsecured creditor | 32.4% | 54.4 |
| Total Landsbanki | 46.0% | 77.2 |
| Yucaipa | | |
| - secured lender | 23.4% | 39.2 |
| - new money investor | 8.9% | 15.0 |
| Total Yucaipa | 32.3% | 54.2 |
| Other unsecured creditors | 21.7% | 36.4 |
| Total New Eimskip equity value | 100.0% | 167.8 |

## 4.5    Composition Claims

A summary of the estimated claims of unsecured creditors as at the Petition Date is set out at Table 10.

Table 10 – Estimate of Composition Claims

| Creditor | Facility | Balance at 31 January 2009 (€m) | Forecast Balance as at Petition Date (€m) | Less Security Claim (€m) | Estimated Composition Claims at Petition Date (€m) |
|---|---|---|---|---|---|
| Landsbanki | Term loan | 149.3 | 174.5 | - | 174.5 |
| Landsbanki (Samson Claim) | Guarantee claim | 210.8 | 221.9 | - | 221.9 |
| Landsbanki | Property mortgages | 17.8 | 15.1 | (14.6) | 0.5 |
| Samson | Term loan | 23.7 | 20.9 | - | 20.9 |
| Bonds | Bonds | 181.6 | 157.5 | - | 157.5 |
| Straumur | Term loan / SWAP | 69.7 | 67.5 | - | 67.5 |
| KingSett / SITQ | Convertible bond | 10.3 | 38.4 | - | 38.4 |
| Nordea | Equipment loan | 1.1 | 1.0 | (1.0) | - |
| Eksportfinans | Vessel mortgage | 7.7 | 7.4 | (7.4) | - |
| Lessors | Finance leases | 19.4 | 19.4 | (19.4) | - |
| XL Lessors | Guarantee claim | 13.5 | 25.2 | - | 25.2 |
| Islandsbanki | Property mortgages | 33.6 | 33.0 | (31.6) | 1.3 |
| Nordic Investment Bank | Property mortgages | 14.8 | 15.0 | (7.2) | 7.8 |
| Chinese Portal Authority | Lease | 15.1 | 13.9 | - | 13.9 |
| Yucaipa | Revolving credit facility | 140.6 | 44.7 | (5.0) | 39.7 |
| Loan Fee | Loan Fee | (1.2) | - | - | - |
| Trade Creditors | Trade Credit | 16.1 | 16.1 | - | - |
| Total voting claimants[1] | | 923.9 | 871.4 | (86.2) | 769.1 |
| Contingent Claims | | 909.0 | - | - | 36.8 |
| Total claimants (incl. Yucaipa) | | 1,832.9 | 871.4 | (86.2) | 805.9 |
| Total claimants (excl. Yucaipa) | | | | | 766.2 |

[1] Please note the 31 January balance above includes a liability relating to the Qingdao Cold Storage facility

This Table 10 excludes claims against Eimskip by other companies within the Eimskip Group, which are assumed to be waived.

Eimskip is the guarantor to a number of third parties where the conditions for making a claim have not been satisfied at the Petition Date. The nature of these contingent liabilities is described at Section 2.4(e).  These contingent liabilities will not be transferred to New

Eimskip.  However, Eimskip considers a realistic estimate of the likely actual claims arising from these contingent claims on a risk-adjusted basis to be approximately €37m and has included this amount in the total Composition Claims. Eimskip has arrived at this estimate on the following basis:

- The estimated gross value of the contingent claims has been reduced to reflect an estimate of the value of any mitigating actions that the prospective claimant would be obliged to take; and

- This net amount has then been discounted by an estimate of the overall probability of the condition precedent for a claim actually occurring.

Pursuant to Article 33(1), item 2 of the Act on Bankruptcy 1991, those claims eligible to vote on the Composition Proposal (**Voting Claims**) exclude those claims where a condition to making the claim remains unfulfilled.  Consequently the total Voting Claims are estimated at €769m as set out in Table 10 above.

## 4.6     Estimated Returns to Unsecured Creditors

On the basis of the estimated value of the shares in New Eimskip that will be transferred to the unsecured creditors, the unsecured creditors will achieve an 11.9% return. This level of return is significantly greater than the level estimated on a hypothetical liquidation of 2.1% described in Section 3 above.

## 4.7     Settlement of Composition Claims

Eimskip anticipates settlement of the Composition Claims after the following have been completed:

(a)     Completion of a vote of those holding Voting Claims pursuant to Article 49 of the Act on Bankruptcy 1991;

(b)     Return of the creditor consents requested in Section 4.8 of this Document;

(c)     Issue of the Composition Order; and

(d)     Completion of the New Eimskip Restructuring Steps which are conditional upon the issuance of a Composition Order.

For those contingent claims where the condition precedent has yet to be fulfilled, Eimskip will set aside equity in New Eimskip allocated to these claimants for the benefit of such claimants in the future.  New Eimskip and Eimskip will agree (as part of arrangements described in Section 4.2(b) above) on procedures relating to the distribution of such shares to these claimants subject to any requirements of law.

Eimskip does not propose to pay interest accrued on Composition Claims between the Petition Date and the date of receipt of the Composition Payments.

Eimskip is unable to provide security to Supporting Creditors during the period between Petition Date and the date of Composition Payments.

## 4.8    Requested Creditor Consent

In order for the Composition Agreement to be confirmed by the District Court of Reykjavik, the Composition Proposal will need the support of 88.1% in value and number of unsecured creditors voting at a general meeting of the unsecured creditors held in accordance with the Act on Bankruptcy 1991.   As at the Petition Date creditors holding approximately €519m of unsecured claims in value and 19 in number have indicated their support for the Composition Proposal.

## 4.9    Conclusion

The Eimskip Board believes that the completion of the transactions set out in this document and the conclusion of a Composition Agreement with unsecured creditors offers the most attractive returns to all creditors of Eimskip.

A failure to conclude a Composition Agreement with unsecured creditors will significantly increase the likelihood of an eventual liquidation of Eimskip. The Eimskip Board believes that returns to unsecured creditors in such a liquidation will be materially lower than those available following the completion of the transactions set out in this document and the conclusion of a Composition Agreement.

The Eimskip Board considers that acceptance of the Composition Proposal is in the best interests of the unsecured creditors of Eimskip:

- New Eimskip will continue to play an important part in the Icelandic economy and the wider world economy.  This is in the best interests of the wider stakeholder group - customers, suppliers, employees, Icelandic consumers and exporters;

- Yucaipa will bring operational experience in logistics and transportation, which may provide significant opportunities to increase equity value via relationships with other portfolio companies in related markets;

- The unsecured creditors of Eimskip will collectively hold a majority shareholding in New Eimskip and will be the main beneficiaries of any increase in equity value.  As global market conditions improve, there is considerable scope for upside in New Eimskip equity value;

- The investment by Yucaipa brings new investment into Iceland and provides a strong balance sheet for New Eimskip going forward;

- Although not part of the Composition Proposal, the self tender contemplated by New Eimskip provides an option for unsecured creditors to monetize some, if not all, of their equity distribution shortly after the date of the Composition Order; and

- The Composition Proposal offers a significantly better outcome than would be achieved in a liquidation.

Based on these considerations, the Eimskip Board recommends acceptance of the Composition Proposal by the unsecured creditors.

## APPENDICES

### 1    EIMSKIP GROUP STRUCTURE CHART

The chart below shows the group structure at the Petition Date.



The RCF security package as it related to this group structure is as follows:

<u>Guarantees</u>

Certain members of the Eimskip Group have granted guarantees and security to support Eimskip's obligations under the RCF. The companies who have granted guarantees are as follows: Eimskip UK Limited,, Eimskip Transport GmbH, Faroe Ship P/F, TVG Zimsen hf., Eimskip B.V., Eimskip Nederland B.V., Eimskip, USA, Iceland Steamship Inc.

<u>Share pledges</u>

Eimskip and certain of the guarantors have pledged their shareholdings in the following companies to ABN as security for their obligations under the RCF: Eimskip, USA, Iceland Steamship Inc., Daalimpex Beheer B.V., Eimskip Nederland B.V., Eimskip B.V., Eimskip Denmark A/S, Eimskip Logistics AB, Faroe Ship P/F., Eimskip Orange ehf, Eimskip Tango ehf, Eimskip UK Limited, Innovate HQ Limited, TVG Zimsen ehf and Eimskip-CTG AS.

The New Eimskip group structure is set out below:



## 2      SCHEDULE OF SUPPORTING CREDITORS

[To be inserted on Petition Date]

3       EIMSKIP GROUP CONSOLIDATED ACCOUNTS AS AT 31 JANUARY 2009

[To be inserted]

## 4    EIMSKIP BALANCE SHEET AS AT 31 JANUARY 2009

| Assets | Eimskip €m |
|---|---:|
| Goodwill | 111.3 |
| Other Intangible assets | 11.0 |
| Property, vessels and equipment | 101.8 |
| Shares in group companies | 406.4 |
| Shares in other companies | 0.0 |
| Financial assets | 7.8 |
| Deferred tax assets | 4.4 |
| **Total non-current assets** | **642.8** |
| Inventories | 1.7 |
| Trade receivables | 30.2 |
| Receivables from Group companies | 152.1 |
| Other receivables | 1.2 |
| Cash and cash equivalents | 5.3 |
| **Total current assets** | **190.5** |
| **Total assets** | **833.3** |
| **Equity** | |
| Share capital | 20.1 |
| (Accumulated deficit) / retained earnings | (101.2) |
| **Total equity** | **(81.1)** |
| **Liabilities** | |
| Loans and borrowings | 188.3 |
| Provisions and other liabilities | 5.6 |
| Deferred tax liability | 0.0 |
| **Total non-current liabilities** | **193.9** |
| Loans and borrowings | 456.1 |
| Trade and other payables | 264.4 |
| **Total current liabilities** | **720.5** |
| **Total equity and liabilities** | **833.3** |

Please note this balance sheet excludes any liabilities relating to the Qingdao Cold Storage Facility.

5     ENTITY PRIORITY MODEL - SUMMARY

**Purpose**

The EPM estimates the returns to creditors in a hypothetical bankruptcy scenario.

**Assumptions**

The general assumptions that have been used to estimate returns in the event of a hypothetical bankruptcy scenario are as follows:

- The date of the hypothetical liquidation is the Petition Date.

- The Eimskip Group would be liquidated and the realisations from the liquidation of each entity used repay local creditors.

- For each entity, value flows to other Eimskip Group companies via:

  > Repayment of intercompany balances (treated as creditors and settled with other external creditors)

  > Distributions to the immediate parent of any surplus value after all creditors are repaid

- The EPM uses the Eimskip Group's Q1 (31 January 2009) accounts and intercompany balances to estimate the flow of value described above. Management is satisfied that the incompany balances due to Eimskip as at 31 January 2009 are still materially correct.

- The RCF security package, consisting of guarantees and share pledges, would be enforced upon a liquidation of Eimskip. In practice, the RCF lender would enforce its pledge over the shares of Eimskip Tango in order to take control of Versacold. The creditors of Eimskip would not receive any value from Versacold as evidenced by the failure of the recent sale process to generate value beyond the level of indebtedness within Versacold. The RCF lender would enforce its guarantees from and pledges over the other Subsidiaries, which would reduce the return to the unsecured creditors.

- The Act on Bankruptcy 1991 is not designed to allow businesses in bankruptcy to continue trading and even if technical restrictions could be overcome, there are very serious commercial issues that are likely to preclude ongoing trading and subsequent sales of businesses out of bankruptcy.

- As Eimskip is the trading entity for the Icelandic business, it is assumed that continued operations of the Icelandic business in liquidation would not be possible as many essential suppliers (facing very substantial losses) would discontinue supplies.

- This would have a "knock on" effect on the other parts of the shipping business, which would find it difficult to continue trading (as creditors with security over vessels and intercompany balances would enforce their security, consequently impairing Eimskip Group operations).

- The remaining business and assets of the Eimskip Group have limited going concern value as they require access to a shipping and transportation network that would no longer be viable.

Based on these core assumptions, the EPM estimates the likely liquidation value for each entity within the Eimskip Group and forecasts the distributions to creditors in each entity, according to the claims in each jurisdiction.

The diagram below provides an overview of the liquidation process modelled in the EPM:



### Eimskip Realisations

Table 6 in Section 3(b) provides a detailed summary of the estimated value available to the unsecured creditors of Eimskip.

Estimated realisations have been based on a conservative approach due to:

- Assets being sold in a bankruptcy and subject to distressed values

- Current market and economic conditions

- Availability of liquidity in the market

A summary of the assumptions used for each major class of asset is detailed below:

### Property Valuations

- Most property owned by Eimskip is pledged to lenders. The recent financial crisis has significantly reduced property valuations in Iceland. In addition, much of the lending is denominated in foreign currency. The depreciation of the ISK since the financial crisis has also significantly reduced the asset security for many lenders in Iceland. As

a result, the majority of proceeds from disposing of property in liquidation would be retained by these lenders.

- The combined rateable and market value of property is €7m. Unencumbered Eimskip property has been included in the EPM at a 50% reduction on valuation (where properties have been valued) or a 50% reduction from rateable value. This is to reflect current economic conditions and likely value realisations in bankruptcy scenario.

- An independent third party provided a valuation for the encumbered property portfolio in Iceland.

## Vessel Valuations

- The Eimskip Group owns 11 vessels, with the majority pledged to finance providers. Two vessels are not pledged to lenders and would return equity value to the Eimskip Group when sold. Eimskip would also benefit from surplus realisations from the sale of two vessels that are expected to sell for more than their pledged debt.

- Independent third party valuations for the vessels owned by the Eimskip Group are not available as ship brokers are not currently prepared to provide valuations, citing current market conditions.

- Given the inability to obtain independent third party valuations for the vessels, company valuations have been undertaken. These valuations have been written down to take account of a sale of the vessels in a bankruptcy scenario and under current economic conditions. However, the Eimskip Group has been unable to sell vessels at these estimated values and consequently the vessels are further discounted (between 20% and 25%) in the EPM.

- The current market valuation of these vessels is €51.5m with a debt value of €21.6m, giving equity of €29.9m. This value flows into the subsidiaries in which the vessels are held.

## Equipment

- The majority of the unpledged equipment owned by the Eimskip Group is very specialised and would be of limited value in a bankruptcy. It has therefore been written down by 75% from book value.

## Inventories

- Inventories held by the Eimskip Group are assumed to be sold piecemeal on a fire sale basis. For this reason they have been written down by 75% from book value.

**Third party receivables**

- Third party receivables of Eimskip are pledged to Landsbanki. Receivables in the Subsidiaries are not pledged to lenders and are assumed to be collectable at 50% of book value due to customer disputes, loss of goodwill and associated legal costs of recovery in bankruptcy.

**Cash**

The cash balances are included in the EPM as an estimate of Eimskip cash available to the unsecured creditors of Eimskip. Treatment of cash in the EPM assumes the following:

- Positive cash balances are assumed to be received in full with no bank set-off. Eimskip cash balance adjusted to reflect the estimated balance as at Petition Date.

**Limitations**

An EPM is a hypothetical analysis and therefore has a number of inherent limitations:

- **The EPM does not take account of the length of time necessary to liquidate the Eimskip Group and assumes a simultaneous flow of funds.** In practice, the realisation of assets and settlement of claims is a protracted process and potentially subject to a time value of money adjustment. It will be necessary to wait until the liquidations of the subsidiaries are complete before any distribution to creditors can be made; a return now therefore provides a greater degree of certainty over timing and quantum for all creditors. It is therefore almost inevitable that actual returns, when adjusted at an appropriate discount rate, will be materially lower than estimated in the EPM. The EPM return in Table 6 has been discounted to reflect the potential time value of money adjustment

- **The Eimskip Group is a complex and multi jurisdictional group.** Whilst the EPM endeavours to model the local ranking of creditors there is the potential for lower than estimated returns to Eimskip should the Eimskip Group enter a bankruptcy process. This may be as a result of certain local claims being deemed to have preferential status, thus reducing the value to Eimskip via its intercompany receivables

- **The EPM does not take account of possible tax charges that may arise on liquidation.** Tax charges in local jurisdictions may reduce realisations from subsidiaries.

- **A number of the subsidiaries will be deemed to be key assets and of strategic value to their local economy.** As such, this gives rise to the possibility of intervention from governmental / regulatory bodies looking to preserve operations in local jurisdictions, thus reducing the estimated outcome for unsecured creditors presented in the EPM

- **Uncertainty surrounding the quantum of claims.** The EPM uses the balance sheet position as at 31 January 2009, which has then been adjusted to account for additional interest payments due up to the liquidation date, however in the event of a bankruptcy there is likely to be an increased level of claims, such as contractual claims and contingent claims not currently reported on the balance sheet

In conclusion, whilst Eimskip believes that the estimates of creditor returns represents an appropriate basis for comparison to the Composition Agreement, creditors should recognise that in practice a liquidation could produce significantly lower returns. It is inevitable that such returns would be paid much later than those proposed in the Composition Agreement and creditors should therefore discount the value of estimated EPM returns accordingly.

6    AGREEMENTS WITH SECURED LENDERS - SUMMARY

Eimskip has reached agreement with all secured lenders prior to the filing of this petition. These lenders are summarised below:

| Lender | Facility | Security | Agreement |
|---|---|---|---|
| Yucaipa | RCF | Share pledges and guarantees | Partial release of debt; further partial release of debt, release of guarantees and pledges following the Composition Order |
| Landsbanki | Property mortgages | Pledges over property | Transfer to HiveCo and return of non core assets |
| Landsbanki | All indebtedness | Pledge over receivables | Release of pledges in return for 13.6% of equity in New Eimskip |
| Islandsbanki | Property mortgages | Pledges over property | Transfer to HiveCo and return of non core assets |
| Nordic Investment Bank | Property mortgages | Pledges over property | Return of property and lease back by HiveCo |
| Danmarks Skibskredit | Vessel mortgage | Pledge over vessels | Transfer to New Eimskip |
| Faroya Bank | Short term loan and overdraft | Pledges over all Faroe Ship fixed assets and guarantee provided by Eimskip | Loans to remain in Faroe Ship |
| Nordea | Term loan | Containers | Transfer to HiveCo |
| Various | Finance Leases | Asset owner | Transfer to HiveCo |

Where secured facilities are impaired (Landsbanki mortgages, NIB mortgages, Islandsbanki non core asset mortgages) the residual balance is treated as an unsecured claim in the composition.

**Property Lenders**

The property portfolio in Iceland that is used in the operations of the core shipping, transportation and logistics businesses is owned by Eimskip, with the majority of properties pledged to providers of mortgage facilities. The approach to secured property lenders is as follows:

**Operational assets**

Those property assets required by the core shipping and transportation business and that are financed by Landsbanki and Islandsbanki will be transferred to HiveCo and subsequently sold to New Eimskip as set out in Section 4.1(e). The value of these assets has reduced materially since the financial crisis began. Islandsbanki has agreed to amend the mortgage facilities as follows:

(a)     Mortgage term extended; and

(b)     The proportion of the principal outstanding not secured at current asset values is converted to non-performing loans.

Where applicable the loans have been converted to ISK from the basket of currencies previously used.

Eimskip will return the property assets pledged to Nordic Investment Bank and have agreed non-binding terms for HiveCo to lease back these three properties.

**Assets not required**

Those property assets pledged to lenders, but not required by the core business going forward have been returned to Landsbanki and Islandsbanki

**Equipment Financing**

Eimskip currently leases the majority of the other operating assets used by the shipping and transportation business.  The lease obligations for cranes, trucks and containers will be transferred to HiveCo as set out in Section 4.1(e).  A loan provided by Nordea, secured on containers will also be transferred to HiveCo with all terms and conditions retained reflecting the operational importance of maintaining the container fleet going forward.

7    BYLAWS OF NEW EIMSKIP

FORM OF

ARTICLES OF ASSOCIATION OF

EIMSKIPAFÉLAG ÍSLANDS EHF.

## 1. COMPANY NAME, DOMICILE AND OBJECT

1.1.

The Company is a Private Limited Company. Its name is Eimskipafelag Islands EHF.

1.2.

The Company's domicile is at Korngarðar 2, 104 Reykjavik, Iceland.

1.3.

The Company's object is the operation, ownership and investments in transportation companies and other related activities.

## 2. THE COMPANY'S SHARE CAPITAL

2.1.

The Company's share capital amounts to ISK 500.000. The share capital is divided into shares of par value one krona each. Each share in the Company shall carry one voteon shareholders' meetings.

A shareholders meeting of the Company held on [        ],2009 has authorized the Board of the Company to increase the share capital of the Company to ISK [        ] in order to finance further investments of the Company. The shareholders give up their pre-emptive rights to that increase of the share capital. This authorization to increase the share capital is valid for the next 12 months.

2.2.

The authorized share capital in the Company may be increased either by vote of the shareholders at a duly convened shareholders meeting in accordance with the provisions of Section V of the Act No 138/1994 on Private Limited Liability Companies (see Articles 23 and 30)

2.3.

The Board of Directors of the Company shall maintain a share register as stipulated by law, and enter therein the name of each shareholder with the date of transactions of shares and date of each entry.

2.4.

Vis-à-vis the Company, the register of shares shall be considered to constitute fully valid evidence of ownership of shares in the Company and transfer of ownership does not enter into effect until the Board has been notified thereof in writing.

2.5.

Shareholders are not responsible for the commitments of the Company in excess of their shareholdings in the Company.

### 2.6.

Transfers of ownership of shares in the Company are not effective until the Board of Directors of the Company has been notified thereof in writing and has been provided with all documentation it reasonably requires to effect such transfer.

### 2.7.

No privileges are attached to shares in the Company.

## 3. ORGANISATIONAL STRUCTURE AND SHAREHOLDERS' MEETINGS

### 3.1.

The supreme authority in the affairs of the Company is in the hands of valid shareholders' meetings.

### 3.2.

An Annual General Meeting shall be held before the end of August each year. The Annual General Meeting shall address the following items of business:

1) The Board of Directors of the Company shall report on the performance and activities of the Company in the preceding year of operation.
2) The balance annual accounts for the preceding year of activities, together with auditors' notes, shall be submitted for approval.
3) A decision shall be made on the disposal of profits or losses, as well as on dividends and allocations to the Company's reserves.
4) Election of the Company's Board of Directors and auditors.
5) A decision shall be made on remuneration to the Members of the Board of Directors for their service during the year of operation.
6) Motions from The Board of Directors regarding a remuneration policy.
7) Discussion and voting on any other lawfully submitted business.

## 4. THE COMPANY'S BOARD OF DIRECTORS AND GENERAL MANAGER

### 4.1.

The Board of Directors of the Company shall be composed of five members and five alternate members, all elected by proportional voting pursuant to Art. 39.6.b. of the Act No. 138/1994 on Private Limited Companies as subsequently amended, at an Annual General Meeting for a term of one year. Signatures of three Members of the Board are binding for the Company, but the affirmative votes of at least four out of five Directors shall be required to approve significant corporate actions as shall be provided for in the Board of Directors rules of procedure.

Minutes shall be kept of Board meetings. Meetings of the Board are legitimate if at least four Directors are present. Board meetings can be held by means of telephone or other communication facilities as to permit all persons to communicate with each other simultaneously and instantaneously and, to the extent Icelandic mandatory law permits, participation in such meeting shall constitute presence in person at such meeting.

The Board of Directors has charge of the affairs of the Company between the shareholders' meetings and guards its interests against any third party.

The Board of Directors allocates tasks among its members by electing a Chairman and Vice-Chairman of the Board.  The Chairman and, in his absence, the Vice-Chairman shall call Board meetings.  Each Director may call a Board meeting.  The General Manager may also call a board meeting.

The Board of Directors shall set down procedures further detailing the execution of its duties.

### 4.2.

The Board of Directors appoints the General Manager of the Company and decide the terms of his employment.  The Board also grants powers of procuration for the Company.

Subject to the Board of Director's rights under Section 4.1 above, the General Manager has charge of the day-to-day operations of the Company and represents it in all matters pertaining to routine operations.  The General Manager, in consultation with the Board of Directors, shall be responsible for accounting and the recruitment of staff. The General Manager shall provide the Directors and Company auditors with all information regarding the operation of the Company that they may request and must be supplied under law.

## 5. ACCOUNTS AND AUDIT

### 5.1.

At the Annual General Meeting a firm of auditors shall be elected for a one year term.

### 5.2.

The operating and financial year of the Company shall be [the calendar year.]  The annual accounts shall be completed and submitted to the auditor no later than one month before the Annual General Meeting.

## 6. OTHER PROVISIONS

### 6.1.

The Company's Board of Directors shall convene shareholders' meetings with a notification to every shareholder by means of mail, telegram or e-mail with request of confirmed reception sent back to the Board of Directors. Shareholders' meetings do not need to be held at the Company's domicile. The Annual General Meeting and extraordinary meetings shall be convened with at least seven days' notice. In the case of an extraordinary meeting convened with briefer notice, the meeting will be deemed lawfully valid if attended by all shareholders and their noted consent thereof. The notice of a meeting shall state the agenda of the meeting.

### 6.2.

These bylaws may be amended at a legitimately convened shareholders' meeting by the approval of shareholders controlling at least 2/3 of the outstanding shares in the Company, unless otherwise stated in Icelandic mandatory law.

### 6.3

Motions for the dissolution or winding up of the Company shall be subject to the same rules as amendments to these bylaws. The approval of shareholders controlling at least 2/3 of the Company's total shares is required to carry such a motion.  A shareholders' meeting that has made a lawful decision to dissolve or wind up the Company shall also decide the allocation of its assets and the payment of its debts.

### 6.4

Matters which are not regulated in these bylaws shall be subject to the provisions of the Act on Private Limited Companies No 138, with later amendments.

6.5

In the event that the Company has issued shares following the conclusion of the "composition" of creditors under Icelandic Bankruptcy law of Hf. Eimskipafélag Íslands and the receipt of €15,000,000 in equity financing from sources contemplated in connection with such "compostion" ("Issuing Date"), the Company shall commence a one-time self tender offer (the "Offer") to repurchase shares in the Company from shareholders of record as of the date of commencement ("Holders") on the following terms:

(i) the Offer shall commence on a date (the "Offer Date"), determined by the Board of Directors, that is within 8 weeks after the Issuing Date;
(ii) the Offer shall end at 16:00 Iceland time on the date that is 14 days after the Offer Date;
(iii) the Offer shall be offered to all Holders;
(iv) the Offer shall not be conditioned upon any minimum number of shares being tendered;
(v) the total amount of funds available to buy back shares in the Offer is €10,000,000, which shall be paid in Icelandic Krona;

(vi) the total number of shares subject to buy back in the Offer shall equal the Conversion Amount divided by the Per Share Price ("Total Tender Shares");

(vii) in the event the aggregate number of shares that Holders elect to tender in the Offer exceeds the Total Tender Shares, the Board of Directors shall purchase shares from tendering Holders on a pro rata basis based on the number of shares tendered; and

(viii) subject to the terms specified above and all applicable laws, the implementation and administration of the Offer (and any ambiguity or conflict in the terms contained herein) shall be determined and resolved by the Board of Directors.

"Company Valuation" means the "Post Composition Equity Value" contemplated under the composition plan, as converted to Icelandic Krona (ISK) at the close of business in Iceland on the Offer End Date based on [the official rate of the Central Bank of Iceland on the Offer End Date].

"Conversion Amount" means:   €10,000,000 as converted to Icelandic Krona (ISK) at the close of business in Iceland on the Offer End Date based on [the official rate of the Central Bank of Iceland on the Offer End Date].

"Per Share Price" means the Company Valuation divided by the total number of outstanding shares in the Company as of the Offer Date.

So approved in Reykjavík on [.]

on behalf of Eimskipafélag Íslands ehf.

**8**      NEW EIMSKIP RESTRUCTURING – SUMMARY OF FINANCIAL PROJECTIONS AND
VALUATION CONSIDERATIONS

**New Eimskip Business Plan**

The New Eimskip business plan dated 25 June 2009 provides financial forecasts for the new group for the years FY09, FY10 and FY11. This business plan provides a summary of the strategy of the new group, an assessment of the core markets in which New Eimskip operates, management's view of forecast financial performance and contains a proforma balance sheet for New Eimskip.

Should parties with a valid Composition Claim require further information relating to this plan they should contact the company.

**Valuation of New Eimskip**

Relevance of valuation to the Composition Proposal

The valuation of New Eimskip is central to the restructuring proposal. The valuation drives the equity allocated to the secured and unsecured lenders. Eimskip believes that the valuation of shipping and transportation businesses are significantly lower than historic norms and the valuation methodology used for the restructuring should recognise that it is reasonable to assume a recovery of value in the medium term.

The mechanics of the restructuring proposal are such that if the New Eimskip valuation is based on current market multiples, then the secured lenders would receive a greater proportion of the equity since the value of their security, as estimated in a hypothetical liquidation scenario, is constant.

Eimskip believes that a current market valuation is therefore detrimental to unsecured creditors and propose an approach that takes a more medium term view.

Key assumptions

The valuation methodology based on a multiple of EBITDA references historic trends and transactions involving comparable companies. The enterprise value of New Eimskip is estimated using the current management forecast EBITDA for FY10 and a multiple of six times. The rationale for these assumptions is set out below.

**FY10 EBITDA**

Eimskip believes that the forecast proforma EBITDA for FY09 of €33.9m is not representative of the New Eimskip business going forward, as the result contains a number of non-recurring items. These items are:

- Exceptional costs relating to the restructuring in FY09 are approximately €3.2m. These costs are not expected to recur in FY10.

- FY09 performance has been negatively affected by the impact of the economic crisis in Iceland. To better match the reduced demand for its services in Iceland, Eimskip

reduced its operating cost structure, the benefit of which is fully reflected in FY10. Capacity was also reduced in Norway during the course of FY09.

- The forecast for FY10 contains only those businesses transferred to New Eimskip, whereas the FY09 result includes businesses and assets disposed of during the restructuring process.

- Finally the FY10 EBITDA forecasts incorporates the rental agreements for properties returned to NIB during the restructuring process. The impact of this is not included in FY09.

In summary Eimskip believes that the forecast for FY10, whilst clearly a forecast and therefore subject to normal market uncertainties and other risks, is a more appropriate basis for the estimation of enterprise value. Eimskip also believes that using a future period EBITDA forecast is consistent with the overall objective to achieve a realistic valuation in the medium term.

**EBITDA Multiples**

Historic analysis of Total Enterprise Value to EBITDA ratio for a comparable set of companies over the past ten years demonstrates the cyclicality of shipping values and the impact of economic downturns during this period.



The table above shows average and median valuation metrics for a comparable set of shipping and logistics businesses to Eimskip over the last ten years. Over this period, valuation multiples have tracked broader global economic conditions which influence global trade.

Therefore Eimskip is comfortable that a multiple of six times EBITDA represents a valuation at the lower end of historic trends but should be above either a value either associated with

distress or the current economic crisis.  This appears to be a reasonable approach to assessing value for New Eimskip.

**Companies within the comparative set**

- Orient Overseas International Ltd
- Horizon Lines, Inc.
- Hyundai Merchant Marine Co. Ltd.
- Hanjin Shipping Co. Ltd.
- Asagami Corp.
- Compania Chilena de Navegacion Interoceanica S.A
- Dampskibsselskabet Norden A/S
- Evergreen Marine Corp. Ltd.
- Green Reefers ASA

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type: Eviction Action

---

Inland American Brooklyn Park Atlas, L.L.C.,

      Plaintiff,

v.

Versacold USA, Inc., f/k/a Atlas Cold Storage
USA Inc.,

      Defendant.

---

Court File No: 27 CV HC 09 7620

**EVICTION COMPLAINT**

For its Eviction Complaint, Plaintiff states and alleges as follows:

1.     This is an action to evict a commercial tenant for material breach of lease.

2.     By Lease dated September 28, 2007 (the "Lease"), Plaintiff leased and demised the premises located at 7130 Winnetka Avenue N, Brooklyn Park, Minnesota 55428 (the "Premises") to Defendant Atlas Cold Storage USA Inc. The Premises are legally described as:

     Lots 14 and 15, Brooklyn Gardens, Hennepin County, Minnesota.

A copy of the Lease is attached as <u>Exhibit A</u>.

3.     Upon information and belief, Defendant is now known by the name "Versacold USA, Inc."

4.     As required the Lease, Defendant's corporate parent, hf Eimskipafelag Islands ("Eimskip"), executed an unconditional Guaranty of the Lease. Eimskip is an Icelandic corporation.



EXHIBIT

B